## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SAMUEL THOMAS,

        Plaintiff,

v.

CITY OF DETROIT, AMRU MEAH, ABDUL M.
AQUIL, LUTHOR WORTHMAN,
and ABC DEMOLITION COMPANY,

        Defendants,

and                                           CIVIL CASE NO. 06-10453

                                           HON. MARIANNE O. BATTANI

CITY OF DETROIT

        Defendant/Counter-Plaintiff,

v.

SAMUEL THOMAS

        Plaintiff/Counter-Defendant.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION TO DISMISS AND GRANTING SUMMARY
## JUDGMENT TO THE CITY OF DETROIT ON ITS COUNTERCLAIM

## I.  INTRODUCTION

Before the Court are Defendant/Counter-Plaintiff City of Detroit's Motion to Dismiss or

in the Alternative Motion for Summary Judgment (Doc. #17), defendants ABC Demolition and

Luther Worthman's Motion to Dismiss or in the Alternative Motion for Summary Judgment

(Doc. #20),[1] and Plaintiff's motion to strike Abdul Aquil's (Doc. ##25 & 34) and Amru Meah's affidavits (Doc. ##23, 24 & 35). Thomas owns property on John R in Detroit, on which a building commonly known as the Studebaker Building stood. He filed an Eighteen Count Complaint against Defendants because the City of Detroit ("the City") hired a demolition contractor to remove the remnants of the Studebaker Building after it burned down, and placed a lien on the property in the amount of the demolition costs. The City filed a counter-complaint, seeking to recover the cost of the demolition. Defendants seek summary judgment on Thomas's, as well as on the City's counter-claim, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56.

## II.      STATEMENT OF FACTS

The City's Buildings and Safety Engineering Department ("BSE") enforces code violations, requires abatement of hazardous conditions, and hires contractors to clear hazardous sites. Defendant Amru Meah is the Director of BSE, and is responsible for overseeing all operations of the Department. Defendant Abdul Aquil is the Assistant Chief of Building Inspections in BSE's Demolition Division. Aquil's duties include: inspecting potentially dangerous building sites, communicating with property owners concerning demolishing dangerous buildings and clearing building sites that pose a danger to the public, and hiring licensed contractors to demolish dangerous buildings and clear building sites that pose a danger to the public, if the owner fails or refuses to do so.

---

[1] ABC Demolition Company filed a motion, but did not file a brief in support of that motion.

2

On March 3, 2000, the Detroit City Council, after providing notice to the owner and an opportunity to be heard, passed a resolution declaring the Studebaker Building to be a dangerous building and authorizing its demolition.  From that date until June 20, 2005, Thomas did not request a deferral of the demolition order, nor did the City attempt to demolish the building.

On the night of June 20, 2005, a fire occurred in the Studebaker Building, destroying the building.  After the fire, the City inspected the building, found that it had collapsed onto the public right-of-way, and confirmed that it constituted a dangerous building under the City's Dangerous Building Ordinance, 1984 Detroit City Code §12-11-28.0, *et seq*.

On June 22, 2005, the City sent a letter to the City Council and to Thomas stating that the site constituted an immediate danger affecting the health, safety and welfare of public, and that the City would utilize emergency measures to have the hazard removed as quickly as possible. The City also sent similar letters to the owner of the adjacent property.  The same day, Thomas sent a letter to the City notifying it that he had retained Ferrous Process & Trading Company ("Ferrous") as his demolition contractor.

On July 6, Director Meah sent a letter to Thomas notifying him that Ferrous did not possess a Class A Wrecking License issued from the City, and therefore, was not eligible to perform the work.  The letter also notified him that failure to retain a company with a Class A Wrecking License would result in legal action against him, and that if Thomas did not commence clearing the site within ten days, the City would do so.

On July 13, the City sent another letter to Thomas informing him that, pursuant to the June 22, 2005, notification of emergency demolition, demolition of Thomas's property must commence by July 15, and that failure to proceed would result in the City retaining a contractor

3

with the fees assessed against the property.  On July 18, Thomas sent a letter to Assistant Chief Aquil in which he re-stated his intentions to handle the site clean-up himself using the proceeds from the salvageable material to finance it, and asking for an additional ten to fifteen days to retain a suitable contractor.  In a letter dated July 26, the City extended the time for Thomas to secure the site and begin removal of the debris until July 29, 2005.

On July 29, Thomas sent a letter to Aquil that acknowledged the extension of the deadline, but noted that because he did not receive the letter until July 28, the extension was, in effect, only for a day.  Thomas also stated his belief that he was being threatened and that the City was not granting him adequate time to handle the clean-up.

Also on July 29, 2005, the City recorded a lis pendens against the property.  The lis pendens provided, in pertinent part:

> Notice is hereby given that proceedings have been commenced and are pending before the Building Inspection Division, Buildings and Safety Engineering Department, City of Detroit, upon proceedings on file in the office of the Building Inspection Division on the above mentioned defendant for the object of causing the building, located upon the land hereinafter  described, to be demolished as an unsafe structure, and the costs of demolition assessed against the property . . . .

The City hired defendant ABC Demolition ("ABC"), a fully licensed demolition contractor, to complete demolition of the building and remove the debris.  On October 7, 2005, ABC completed removal of the debris.  As a result of the demolition, the City expended or incurred approximately $485,351.50 in costs and sought reimbursement from Thomas.

On February 1, 2006, Thomas filed the present action against the City, Aquil, Meah, ABC and ABC's principal, Luthor Worthman.  In an Eighteen Count Complaint, he alleges that the City, acting through its officials, Meah and Aquil, placed intense and unreasonable pressure on him to immediately clean up the site.  He claims they created an artificially tight deadline,

and repeatedly demanded that he clean the site without the benefit of the proceeds of his salvageable bricks and steel, which he claims were worth approximately $2,000,000 million dollars.  He alleges the City overcharged him by at least $200,000 for the clean-up fee, and deprived him of property worth at least $2 million dollars.

On March 9, 2006, defendants City of Detroit, Amru Meah and Abdul Aquil filed an Amended Answer to Complaint and Affirmative Defenses.  On the same date, the City filed a counterclaim against Defendant to recover its demolition costs.  Defendants request that the Court dismiss all claims against them asserted by Thomas, pursuant to FED. R. CIV. P. 12(b)(1) and (6) or FED. R. CIV. P. 56.  The City also requests that the Court grant it summary judgment on its counterclaim against Thomas pursuant to FED. R. CIV. P. 56.

## III.    STANDARD OF REVIEW

### A.    Motion to Dismiss

"A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists."  DLX, Inc. v. Kentucky, 381 F.3d 511, 516 (6th Cir. 2004).  A district court has no subject matter jurisdiction over a claim if that claim is barred by the Rooker-Feldman doctrine, res judicata, or by the Eleventh Amendment.  Id.

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint which fails "to state a claim upon which relief may be granted."  "This rule allows a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if every allegation in the complaint is true.  Under this standard, a complaint should be dismissed only where it

5

appears that the plaintiff can prove no set of facts in support of his claim which would entitle

him to relief." Tidik v. Ritsema, 938 F.Supp. 416, 421 (E.D. Mich. 1996). The Sixth Circuit has

made it clear that "[a] complaint must contain either direct or inferential allegations with respect

to all material elements necessary to sustain a recovery under some viable legal theory." Weiner

v. Klais & Co., 108 F.3d 86, 88 (6th Cir. 1997). The United States Supreme Court recently

reiterated this principle, holding that a complaint that fails to allege facts supporting basic

elements like loss and loss causation fails to satisfy Federal Rule of Civil Procedure 8. See Dura

Pharms., Inc. v. Broudo, 544 U.S. 336, 338 (2005). When faced with a FED. R. CIV. P. 12(b)(6)

motion to dismiss, a district court,

> . . . must construe the complaint in the light most favorable to the plaintiff, accept
> all factual allegations as true, and determine whether the plaintiff undoubtedly can
> prove no set of facts in support of his claims that would entitle him to relief.
> Meador v. Cabinet for Human Resources, 902 F.2d 474, 475 (6th Cir.), cert.
> denied, 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990). A complaint need
> only give "fair notice of what the plaintiff's claim is and the grounds upon which
> it rests." Lawler v. Marshall, 898 F.2d 1196, 1199 (6th Cir. 1990) (quoting
> Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)). A
> judge may not grant a FED. R. CIV. P. 12(b)(6) motion to dismiss based on a
> disbelief of a complaint's factual allegations. Id.

In re DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir. 1993). However, the court does not

give the presumption of truthfulness to any legal conclusions, opinions, or deductions, even if

they are couched as factual allegations. Sexton v. Barry, 233 F.2d 220, 223 (6th Cir. 1956);

Tidik, 938 F.Supp. at 421; Western Mining Council v. Watt, 643 F.2d 618, 629 (9th Cir. 1980);

Mitchell v. Archibald & Kendall, Inc., 573 F.2d 429, 432 (7th Cir. 1978). Accordingly, to

determine whether a complaint should be dismissed for failure to state a claim under Rule

12(b)(6), this court must examine the applicable substantive law and the facts alleged in the

plaintiff's complaint.

**B.**      **Motion for Summary Judgment**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact.  See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002).  "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court -- that there is an absence of evidence to  support the nonmoving party's case."  Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue.  FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002).  "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."  Anderson v. Liberty Lobby Inc., 477 U.S. 242,  256 (1986).  The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor.  See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

7

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984)(citation omitted)(quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)). To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50. "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant. Anderson, 477 U.S. at 252.

## IV.    ANALYSIS

### A.    Thomas's Motion to Strike Aquil's and Meah's Affidavits

Plaintiff asserts that Aquil's and Meah's affidavits contain opinions not based on their personal knowledge and not worthy of belief. He contends that they are filled with hearsay not entitled to any weight. "Affidavits submitted in support of a motion for summary judgment must 'set forth such facts as would be admissible in evidence.' Fed.R.Civ.P. 56(e)." Gilleland v.

8

Schanhals, 55 Fed. Appx. 257, 261, 2003 WL 68145, (6th Cir. 2003).  It is within the district court's discretion to strike hearsay and conclusory allegations.  Id., see also Wiley v. U.S., 20 F.3d 222, 225-26 (6th Cir. 1994)("hearsay evidence cannot be considered on a motion for summary judgment.").  Moreover, in this Circuit, it is well settled that " 'only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" Id., at 226 (citing Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988)). Admissible evidence is defined as "evidence that is relevant and of such a character . . . that the court should receive it."  BLACK'S LAW DICTIONARY 576 (7th Ed.1999)).

To the extent that Meah's and Aquil's affidavits are not based on personal knowledge, there are hereby STRICKEN.  The Court will not consider any portion of the affidavits not based on personal knowledge in determining whether Defendants' motion will be granted.

 **B.** **The City's Inherent and Statutory Powers Are Not a Complete Defense to Thomas's Claims**

Defendants' first basis for their motion is that Thomas had no legal right to attempt to scavenge the rubble for salvageable material if the detritus constituted a hazardous area.  They contend that the City has the inherent and statutory power to restrict access to a hazardous area to protect the public health and safety.  Thomas asserts various reasons why this basis for Defendants' motion should be dismissed, most often by invoking the word "kleptocracy." However, the heart of this arguments is that, although the City has an obligation to protect the public health, safety, and welfare, it cannot achieve that obligation through arbitrary and capricious actions that violate the constitutional rights of property owners.  Thomas alleges that the City imposed unreasonably tight deadlines for the clean-up that prevented him from negotiating the most reasonable price for clean-up, and arbitrarily denied him a permit to use the

9

scrap metal and salvageable bricks to defray the clean-up costs.  He contends that these actions
constitute an abuse of any lawful authority the City possessed to protect the public health, safety,
and welfare.

> The public peace and health and for the safety of persons and property.  In
> providing for the public peace, health, and safety, a city may expend funds or
> enter into contracts with a private organization, the federal or state government, a
> county, village, or township, or another city for services considered necessary by
> the legislative body.

MICH. COMP. LAWS ANN. § 117.3 (j).  A state, exercising its police power, may require licenses
for various businesses, ". . .and prescribe reasonable regulations in respect of them, to be
enforced according to the legal discretion of a commissioner without violating the Federal
Constitution, . . ." if "[t]he general nature of the business is such that, unless regulated, many
persons may be exposed to misfortunes against which the legislature can properly protect them."
Brazee v. People of State of Mich., 241 U.S. 340, 343 (1916).

Defendants assert that the City's inherent and statutory powers are a complete defense to
Thomas's claims.  However, legal authority does not immunize it from all suits.  The City may
be authorized to do certain things, but it cannot exercise that authority in a manner that violates
an individual's constitutional rights.  Thus, even though the City may condemn property, it
cannot do so in a manner that offends due process.  Whether or not the City's authority to clean-
up the site was a lawful exercise of that authority is dependent on how the authority was
exercised, and must be examined in light of Thomas's individual claims.  Thus, the Court cannot
say that merely because the City possessed certain authority, all of Thomas's claims must
necessarily be dismissed.  Rather, an individualize inquiry is needed to determine if the City
exercised its authority in a manner that violated his rights.

10

C.  **Governmental Immunity Protects the City and Meah From All of Thomas's Tort Claims, and Thomas's Fraud and IIED Claims Against Aquil**

Governmental agencies, as well as officers and employees, are generally shielded from tort liability if the complained of actions are in furtherance of a governmental function.  MICH. COMP. LAWS ANN. § 691.1407.  However, "an individual employee's intentional torts are not shielded by our governmental immunity statute . . . ."  Sudul v. City of Hamtramck, 562 N.W.2d 478, 479 (Mich. Ct. App. 1997).

Thomas argues that governmental immunity does not protect the City defendants because his state-law tort claims incorporate by reference causes of action that arise under federal law. He cites a number of cases that he contends support this argument.  However, those cases offer no such support.  Merely by incorporating federal causes of action by reference into state law tort claims does not elevate the status of the state law tort claims into federal claims brought under § 1983.

Moreover, "[i]n Smith v. Dep't of Public Health, 428 Mich. 540, 544, 410 N.W.2d 749 (1987), reh. den. 429 Mich. 1207 (1987), cert. gtd. sub. nom. Will v. Mich. Dep't of State Police, 485 U.S. 1005, 108 S.Ct. 1466, 99 L.Ed.2d 696 (1988), a majority of the Supreme Court held that '[t]here is no "intentional tort" exception to governmental immunity.'"  Bischoff v. Calhoun County Prosecutor, 434 N.W.2d 249, 251 (Mich. Ct. App. 1988).  Because the City has the authority to order the demolition of unsafe structures and file a lien for the costs, the City was engaged in the exercise or discharge of a governmental function and is entitled to governmental immunity.  See MICH. COMP. LAWS. ANN. § 125.541 (5)-(6), see also Franken Investments, Inc. v. City of Flint, 218 F.Supp. 2d 876, 882 -883 (E.D. Mich. 2002).  Thomas does not dispute that

11

Meah is the highest appointive executive official in the BSE.  Therefore, he also is immune from state law tort liability.  <u>Bischoff</u>, 434 N.W.2d at 251.

Aquil, as a lower city official, does not enjoy absolute immunity.  However, even though Thomas alleges that Aquil committed intentional torts, he has presented no evidence that tends to prove either the common law fraud or IIED claims.

In order to prove the fraud claim, Thomas must establish that (1) the defendant made a material representation, (2) the representation was false, (3) when the defendant made the representation, he knew that it was false or made it recklessly, without knowledge of its truth as a positive assertion, (4) the defendant made the representation with the intention that the defendant would act on it, (5) the plaintiff acted in reliance on it, and (6) the plaintiff suffered damages.  <u>M. & D., Inc. v. McConkey</u>, 585 NW2d 33, 36 (Mich. Ct. App. 1998).  In addition, Thomas has not pleaded fraud with the particularity required by FED. R. CIV. P. 9.  Therefore Count VIII of Thomas's Complaint is DISMISSED.

The Michigan Supreme Court has not formally recognized that the tort of intentional infliction of emotional distress.  <u>See</u> <u>Roberts v. Auto-Owners Ins. Co.</u>, 374 N.W.2d 905 (Mich. 1985).  The Michigan Supreme Court observed in <u>Roberts</u>:

> Those courts which have recognized intentional infliction of emotional distress as a separate theory of recovery have generally embraced the Restatement definition of the tort:
> § 46. Outrageous Conduct Causing Severe Emotional Distress
> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. [Restatement Torts, 2d, § 46, p 71.]

374 N.W.2d at 908.  In accord with the Restatement, the Michigan Court of Appeals has found four essential elements to a claim for intentional infliction of emotional distress: (1) extreme and

outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. Lewis v. LeGrow, 670 N.W.2d 675, 689 (Mich. Ct. App. 2003). To establish a prima facie case of intentional infliction of emotional distress, "it has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Rosenberg v. Rosenberg Bros. Special Account, 351 N.W.2d 563, 567 (Mich. Ct. App. 1984)(quoting Restatement 2d, § 46, comment d). Instead, a defendant may be found liable "'only where the [defendant's] conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Roberts, 374 N.W.2d at 909 (quoting Restatement Torts, 2d, § 46, comment d, pp 72-73). There is no evidence that would support this claim even if the City defendants were not protected by governmental immunity. Therefore, Count XVIII is DISMISSED. Thomas's remaining state law tort claims, as against Aquil, are discussed in more detail below.

### D.     Thomas's Due Process Claims

#### 1.     Procedural Due Process

"The Due Process Clause of the Fourteenth Amendment does not prohibit every deprivation by the state of an individual's life, liberty or property. Only those deprivations carried out without due process are actionable under 42 U.S.C. § 1983. Generally, the process

13

that is due before the state may deprive an owner of property includes notice to the owner prior to the deprivation and an opportunity for a predeprivation hearing." Harris v. City of Akron, 20 F.3d 1396, 1401 (6th Cir. 1994). The Supreme Court has held that, in some situations, a state may satisfy procedural due process by providing "some meaningful means by which to assess the propriety of the State's action at some time after the initial taking." Parratt v. Taylor, 451 U.S. 527, 539. Applying those principles, the Sixth Circuit has held that a plaintiff can prevail in a § 1983 procedural due process claim in one of two ways: "(1) by demonstrating that he is deprived of property as a result of established state procedure that itself violates due process rights; or (2) by proving that the defendants deprived him of property rights pursuant to a 'random and unauthorized act' *and* that available state remedies would not adequately compensate for the loss." Macene v. M.J.W., Inc., 951 F.2d 700, 706 (6th Cir. 1991)(emphasis in original).

Thomas contends that whether he refused to clean up the site after being given notice, and an opportunity to do so is a genuine question of material fact. He claims that the City blocked every reasonable effort that he made to use his own resources to clean up his property. The City rejected his clean-up plan, threatening litigation if he proceeded as planned with the Ferrous Metals Company.

Thomas has offered no argument as to how the City's established procedures violate due process. Nor has he provided any evidence that the City has deprived him of property pursuant to a "'random and unauthorized act,'" or that state remedies would not adequately compensate him for the deprivation of his property. Id. This failure alone is fatal to his claims.

14

Nevertheless, to the extent that he was entitled to any due process, he was provided with all to which he was entitled. The City did give Thomas ample notice and opportunity to be heard regarding the March 3, 2000, resolution declaring his property to be a dangerous building, and authorizing its demolition. The City took no action on that resolution until after the June 2005, fire, in which the building collapsed onto the public right-of-way. Even then, the City gave Thomas notice that the site had to be cleared, and that he had the right to do it himself. If he did not do so within a reasonable period of time, then the City would undertake the project at his expense. Thomas was also notified that the City's ordinances required him to hire a demolition contractor with a Class A Wrecking License if he did not wish to face a suit from the City. Ferrous Metals Company did not possess such a license. The fact that Thomas did not choose a contractor with a Class A Wrecking License is not evidence that the City denied him due process. Moreover, Thomas received the same notices as the adjacent property owner, who had no trouble complying with the deadlines. Thus, even looking at the facts in a light most favorable to Thomas, there is no basis to find that the City's actions violated his due process rights.

## 2.    Substantive Due Process

As a general rule, when a constitutional amendment "provides an explicit textual source of constitutional protection against . . . intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Graham v. Connor, 490 U.S. 386, 395 (1989). More specifically, the Sixth Circuit has recognized that "[t]he takings clause itself addresses whether and under what circumstances the government may take an individual's property, which is why a number of other circuits have

15

concluded that no room is left for the concept of substantive due process." Montgomery v. Carter County, Tenn., 226 F.3d 758, 769 (6th Cir. 2000) (citing Armendariz v. Penman, 75 F.3d 1311, 1323-27 (9th Cir. 1996)) ("[S]ince the Takings Clause provides an explicit textual source of constitutional protection against private takings, the Fifth Amendment (as incorporated by the Fourteenth), not the more generalized notion of substantive due process, must be the guide in reviewing the plaintiffs' claim of a private taking.")(internal citations and quotations omitted); Buckles v. Columbus Municipal Airport Authority, 90 Fed.Appx. 927, 931 (6th Cir. 2004)("[A]s for the taking of real estate, a substantive due process claim that merely restates the more specific claim will not lie.").

Likewise, the Fourth Amendment protects against unreasonable searches and seizures by the government.

> "Seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property, United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984), and a "seizure" may occur in both civil and criminal contexts. There can be no question that the city's actions against the Freeman's apartment buildings constituted a "seizure". *See* Soldal v. Cook County, Ill., 506 U.S. 56, 62 & n. 7, 113 S.Ct. 538, 544 & n. 7, 121 L.Ed.2d 450 (1992), (holding that the forcible removal of a mobile home, leaving the owners dispossessed, constituted a "seizure" under the Fourth Amendment).

Freeman v. City of Dallas, 242 F.3d 642, 648, fn. 5 (5th Cir. 2001). Because there is a constitutional amendment that "provides an explicit textual source of constitutional protection against . . . intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Graham, 490 U.S. 386, 395 (1989). In this case, Thomas property deprivation claims should have been brought under

16

either the Fourth Amendment or the Fifth Amendment Takings Clause.  Therefore Count XV of

Thomas's Complaint is DISMISSED.

> **E.     Thomas's Fifth Amendment Claim**

> As we have explained, however, because the Fifth Amendment proscribes takings
> without just compensation, no constitutional violation occurs until just
> compensation has been denied.  The nature of the constitutional right therefore
> requires that a property owner utilize procedures for obtaining compensation
> before bringing a § 1983 action.

Williamson County Regional Planning Com'n v. Hamilton Bank of Johnson City, 473 U.S. 172,

194 n.13 (1985).  Thomas did not seek, and has not been denied just compensation through state

procedures.  Williamson, 473 U.S. at 193-94.  To the extent that Plaintiff claims his property has

been taken in violation of the Fifth Amendment, his claims are not ripe.  He cannot suffer "a

violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain

just compensation through the procedures provided by the State for obtaining such

compensation."  Id., at 195.  A property owner may bring an inverse condemnation action in

Michigan to obtain just compensation for an alleged taking of property.  Electro-Tech, Inc. v.

H.F. Campbell Co., 445 N.W.2d 61, 62 (Mich. 1989); Lake Angelo Assoc. v. White Lake, 498

N.W.2d 1, 4 (Mich. App. 1993).  Thomas has not shown that the inverse condemnation

procedure is unavailable or inadequate, and until he has utilized that procedure, any claim that

Defendants violated his Fifth Amendment rights is premature.  Id., at 196.  Therefore, Count

XVI of Thomas's Complaint is DISMISSED.

> **F.     Thomas's  Equal Protection Claim**

"Citizens are cloaked at all times with the right to have the law applied to them in an

equal fashion-undeniably, the right not to be exposed to the unfair application of the laws based

17

on their race." U.S. v. Avery, 137 F.3d 343, 353 (6th Cir. 1997). Thomas claims that his Equal

Protection rights were violated because the City treated his neighboring land owner, Herbert

Berger who is Caucasian, much better than it treated him. Thomas claims that the City met with

Berger many times to discuss the situation and was cooperative with him. The only evidence in

the record, however, establishes that Berger, after receiving the same notices that Thomas did,

had his site cleared by a City-licensed contractor. Nor is the allegation that the City arbitrarily

rejected Thomas's proposals supported by the evidence. Thomas was notified that the City's

ordinances required him to hire a demolition contractor with a Class A Wrecking License. The

fact that Thomas did not do so is not evidence that the City acted in a manner that treated him

differently because of his race. Therefore, Count VI of Thomas's Complaint is DISMISSED.

### G.       Thomas's 42 U.S.C. §§ 1981 & 1982 Claim

Thomas asserts that his right to sell salvageable property worth approximately

$2,000,000, and to use proceeds to pay clean up costs was impaired by the City. He alleges that

the City did so under the pretext of a declared emergency and a claimed need to clean up his

approximately four acre parcel of land. He also asserts that the City continuously interfered with

his rights to make and enforce contracts by, in effect, making it unreasonably difficult, if not

impossible, for him to make and enforce the contracts necessary to clean up or salvage his

property. In addition, Thomas alleges that the City has interfered with his right to sell and hold

real property because it has imposed a lien for the clean-up costs in the amount of $485,000, plus

interest. He contends that the lien has made the property unmarketable.

Article I, § 10, of the Federal Constitution provides: "No State shall . . . pass any . . . Law

impairing the Obligation of Contracts . . . ." Thus, "the contracts clause of the Constitution

18

protects the obligations of contracts from being impaired by legislation . . . ." <u>Rossborough Mfg. Co. v. Trimble</u>, 301 F.3d 482, 490 (6th Cir. 2002).  "The Supreme Court has recognized three components to the inquiry whether a change in state law has created a substantial impairment of a contractual relationship: (a) whether there is a contractual relationship, (b) whether a change in law impairs that contractual relationship, and (c) whether the impairment is substantial." <u>Wojcik v. City of Romulus</u>, 257 F.3d 600, 612 (6th Cir. 2001).

> Section 1982 protects the right of citizens to "hold" real and personal property.  It states:

>> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

> Section 1982 was enacted to enable Congress to enforce the Thirteenth Amendment, specifically to "prohibit all racial discrimination, private and public, in the sale and rental of property." <u>Jones v. Alfred H. Mayer Co.</u>, 392 U.S. 409, 437, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968).

<u>U.S. v. Brown</u>, 49 F.3d 1162, 1166 (6th Cir. 1995).

Thomas has not pointed to a "change in state law has created a substantial impairment of a contractual relationship . . . ." <u>Wojcik</u>, 257 F.3d at 612.  Moreover, even if § 1982 could be read to apply in this circumstance, there is absolutely no evidence that the City defendants took any actions based on his race.  Aquil, BSE's Assistant Chief of Building Inspections, attested that he has never met Thomas, and therefore, could not testify as to his race.  He also denies taking any actions whatsoever based on race.  Thus, Count VII of his Complaint must be DISMISSED.  <u>See</u> <u>Wojcik</u>, 257 F.3d at 612.

### H.   Thomas's Unjust Enrichment, Common Law Conversion, and Statutory Conversion Claims

"The elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." Barber v. SMH (US), Inc., 509 N.W.2d 791, 796 (Mich. Ct. App. 1993). There is no evidence that the City defendants received any benefit from the removal of the debris from Thomas's property. Thomas's theory is that Meah and Aquil may have benefitted through illegal kickbacks or bribes from ABC. There is absolutely no evidence of this, and Thomas cannot survive summary judgment by claiming some evidence supporting his theory may be elicited on cross-examination. Thus, Count X of Thomas's Complaint is DISMISSED.

"'Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.'" Thoma v. Tracy Motor Sales, Inc., 104 N.W.2d 360, 362 (Mich. 1960)(quoting Nelson & Witt v. Texas Co., 239 N.W. 289, 291 (Mich. 1931)). Because the City had the authority to order the site clean-up, and because Thomas received a notice and opportunity to be heard regarding the March 3, 2000, resolution declaring his property to be a dangerous building and authorizing its demolition, there is no basis to assert a claim that Defendants exercised unlawful dominion over Thomas's property. Accordingly, Counts XI and XIII of Plaintiff's Complaint are DISMISSED.

**I.      Thomas's Accounting Claim**

"An action for an accounting is equitable in nature, but whether a plaintiff has stated a cause of action for an accounting must be determined from the facts pled in the plaintiff's complaint rather than from the prayer for relief." Boyd v. Nelson Credit Centers, Inc., 348 N.W.2d 25, 27 (Mich. Ct. App. 1984). "An accounting is unnecessary where discovery is

sufficient to determine the amounts at issue." <u>Boyd v. Nelson Credit Centers, Inc.</u>, 348 N.W.2d 25, 27 (Mich. Ct. App. 1984). "The allegations in [Thomas's] complaint do not support an inference that the transactions at issue are so complex that ordinary discovery procedures would be inadequate." <u>Id</u>. Therefore, Count XIV of Thomas's Complaint is DISMISSED.

**J.     Thomas's Conspiracy Claims**

Thomas alleges that the individually named defendants conspired in order discriminate against him because of his race, to deprive him of his constitutional rights, and to steal his property by denying him the ability to salvage the remnants of the fire, and instead, hiring a contractor that would kickback a portion of the salvageable value of the material.

The essential elements of a civil conspiracy under Michigan common law are (1) concerted action; (2) by two or more persons; (3) to accomplish an unlawful purpose; (4) or a lawful purpose through unlawful means. <u>Admiral Ins. Co. v Columbia Casualty Ins. Co.</u>,486 N.W.2d 351, 358 (Mich. Ct. App. 1992), <u>Mays v Three Rivers Rubber Corp.</u>, 352 N.W.2d 339, 341 (Mich. Ct. App. 1984). The elements of a cause of action under 42 U.S.C. § 1985(3) are similar.

The standard for proving a civil conspiracy is as follows:

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.  Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

Collyer v. Darling, 98 F.3d 211, 229 (6th Cir. 1996)(quoting Hooks v. Hooks, 771 F.2d 935, 943-44 (6th Cir. 1985).  In order to establish a violation of 42 U.S.C. §1985(3), "the plaintiff must prove (1) a conspiracy involving two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons the equal protection of the laws and (3) an act in furtherance of that conspiracy (4) that causes injury to person or property, or a deprivation of a right or privilege of a United States citizen."  Id., at 233.  "The plaintiff must also show the conspiracy was motivated by racial, or other class based animus."  Id.

In this case, Thomas has not proffered any evidence that could lead a rational trier of fact to find that Aquil, Meah, and Worthman conspired to "steal" his salvageable bricks and steel, or deprive him of a constitutional right or privilege because of his race through concerted action. To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue.  "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Michigan Paytel, 287 F.3d at 534(quoting Matsushita, 475 U.S. at 587).  There is absolutely no evidence of racial discrimination, or that Aquil and Meah conspired to "steal" the salvageable material because there is no evidence they received any benefit from awarding the demolition contract to ABC.  Thus, even drawing all *reasonable* inferences in Thomas's favor, no reasonable fact

22

finder could conclude that Defendants conspired to steal his property, or deprive him of his constitutional rights *because* of his race.  Thus, Counts II, III, V, IX, XII,  and XVII of Thomas's Complaint are DISMISSED.  Moreover, because Thomas has not come forward with any evidence supporting any of his federal claims, his 42 U.S.C. § 1983 claim in Count I is DISMISSED.

### K.      The City's Counterclaim

The City filed a counterclaim against Thomas, seeking to recover the cost of the demolition.  Detroit City Ordinance Section12-11-28.6 provides that "[w]here an owner who was served with a dangerous building notice refuses or neglects to comply with the requirement to abate the dangerous condition, the corporation counsel shall be advised of the fact, and if necessary, may institute the appropriate action to compel compliance."  MICH. COMP. LAWS. ANN. § 125.541 (5) states that "the cost of the demolition . . . shall be reimbursed to the city . . . by the owner or party in interest in whose name the property appears."  Section 124.541(6) provides for notice of the amount of the costs to "[t]he owner or party in interest in whose name the property appears upon the last local tax assessment records . . . ."  Section 125.541(6) further states that failure to pay the demolition costs results in a lien against the property, and that a properly recorded "lien for the cost shall be collected and treated in the same manner as provided for property tax liens under [§§ 211.1 to 211.157]."  Id.  See also Franken Investments, Inc. v. City of Flint, 218 F.Supp. 2d 876, 882 -883 (E.D. Mich. 2002).

There is no dispute that the City has the authority to assess the cost of the demolition against the property, and because there is no basis to find that the City exercised its statutory

authority in an unlawful manner, the Court finds there is no basis to deny the City's counterclaim.

**V.      CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary

Judgment is **GRANTED.   IT IS FURTHER ORDERED** that Plaintiff's Complaint is

**DISMISSED** in its entirety.

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATED: February 28, 2007

**CERTIFICATE OF SERVICE**

Copies of this Order were served upon counsel of record on this date by ordinary mail
and/or  electronic filing.

s/Bernadette M. Thebolt
DEPUTY CLERK

24